**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-208

WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT,

    Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the United States Department of Agriculture,

    Respondent.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

### INTRODUCTION

1.      Petitioners WildEarth Guardians and Western Watersheds Project challenge Respondent U.S. Forest Service's Environmental Assessment (EA) and Decision Notice and Finding of No Significant Impact (DN/FONSI) analyzing and authorizing use of the newly formed Wishbone grazing allotment within the Rio Grande National Forest.  This new allotment is authorized for use by domestic sheep, which pose a high risk of transmitting disease to near-by bighorn sheep populations.

2.      The Forest Service acknowledged the overwhelming scientific evidence that domestic sheep transmit pathogens to bighorn sheep when the species come in contact, which often leads to deadly pneumonia in bighorn populations.  These pneumonic events cause large-scale die-offs in bighorn populations as well as high mortality of lambs for many years after a disease episode.  Bighorn numbers throughout the West are a small percentage of their historic

size due primarily to disease from domestic sheep.

3.      Federal agency land management policy—including Federal Respondent U.S. Forest Service policy—is to keep the species separate to avoid disease transmission to bighorns. This task becomes difficult when domestic and bighorn sheep graze near each other on public land.  Not only do bighorn sheep frequently travel outside of their normal home range, domestic sheep also frequently stray from their large bands and can remain unattended on public land for weeks or even months.  Due to their close relation to each other and gregarious natures, bighorn sheep and domestic sheep are attracted to each other and will seek each other out, making contact on the open range even more likely.

4.      Recognizing the risk of disease transmission, the Forest Service and Bureau of Land Management have closed grazing allotments to domestic sheep use (sometimes in response to court orders) where the allotments posed a danger to bighorn sheep.  The Rio Grande National Forest closed three allotments to domestic sheep when it determined the allotments posed a high risk to near-by bighorn sheep herds.  It then created a new allotment, called the Wishbone allotment, to allow those same domestic sheep to continue grazing on the forest.

5.      Although the agency initially determined the Wishbone allotment also posed a high risk of disease transmission to the same bighorn herds, it lowered the risk rating to moderate based on a number of flawed assumptions about habitat use and movements of these bighorn sheep and the ability to prevent stray domestic sheep.  The Forest Service then authorized domestic sheep to graze the Wishbone allotment in a 2018 Decision Notice.

6.      The Forest Service's assumptions used to lower the risk posed by the Wishbone allotment were flawed because they were not supported by science and information in the record,

and ignored important new telemetry data from the near-by bighorn herds.  In fact, the limited information in the record discussing the recent telemetry data contradicted many of the Forest Service's assertions about these bighorn herds.  Yet the agency did not obtain and analyze the data on these herds that Colorado Parks and Wildlife ("CPW") had collected since early 2016, despite being aware of its existence.  Thus, the Forest Service ignored the best available information about location and movement of the bighorn sheep populations in the area.

7.     The Forest Service had authorized use of the Wishbone allotment on a trial basis in 2016 and 2017, and substantial domestic sheep straying occurred in 2017 that resulted in stray sheep remaining behind for weeks after the grazing season ended.  The Forest Service had documented additional instances of stray sheep and other noncompliance issues in previous years related to the same grazing permittees.  Despite these known problems, the Forest Service claimed that the permittees would be able to prevent stray domestic sheep when grazing the Wishbone allotment.

8.     The Forest Service's unsupported assumptions and flawed analysis about the risk to bighorns from grazing domestic sheep on the Wishbone allotment undercut its EA and FONSI and violated the National Environmental Policy Act (NEPA).  Those flaws also undermined the Forest Service's conclusion that grazing the Wishbone allotment will not impair the viability of bighorn populations on the forest, as required under the Rio Grande Forest Plan.  By acting inconsistently with the Forest Plan, the Forest Service violated the National Forest Management Act (NFMA).

9.     Accordingly, Petitioners challenge the Wishbone EA and DN/FONSI as being arbitrary, capricious, an abuse of discretion, and contrary to NEPA and NFMA, and therefore

request the Court set them aside pursuant to the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq*.; NEPA, 42 U.S.C. § 4321 *et seq*.; NFMA, 16 U.S.C. § 1600 *et seq*.; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq*.  An actual, justiciable controversy now exists between Petitioners and Respondent, and the requested relief is therefore proper under 5 U.S.C. §§ 701-706 and 28 U.S.C. §§ 2201-02.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the public lands and resources in question are located in this district.

12.     The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

13.     Petitioners have exhausted their administrative remedies.

## PARTIES

14.     Petitioner WILDEARTH GUARDIANS is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians has over 223,000 members and supporters, many of whom have particular interests in bighorn sheep.  Headquartered in Santa Fe, New Mexico, Guardians maintains several other offices around the West, including in Denver, and has many members who live and regularly recreate throughout Colorado.

15.     Petitioner WESTERN WATERSHEDS PROJECT is a non-profit organization

headquartered in Hailey, Idaho with over 6,000 members and supporters, which is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West.  WWP, as an organization and on behalf of its members, is concerned with and active in seeking to protect and restore wildlife, fisheries, and other natural resources and ecological values of watersheds throughout the West, including in Colorado.

16.     Petitioners, and their staff and members, have deep and long-standing interests in the preservation and protection of bighorn sheep, which interests are directly harmed by Respondent's action challenged herein.  Petitioners' staff and members use and enjoy public lands on the Rio Grande National Forest, including areas on or near the Wishbone allotment, in order to observe, photograph, study, and enjoy bighorn sheep and other wildlife species. Petitioners and their staff and members derive recreational, scientific, aesthetic, spiritual, and commercial benefits from the existence in the wild of bighorn sheep through observation, study, photography, and other pursuits.  Petitioners will continue to use public lands in and around the Wishbone allotment in 2019 and beyond for these purposes, and their enjoyment will be reduced if the bighorn populations in the area are adversely affected by disease.

17.     Petitioners have been advocates for bighorn sheep in many parts of Colorado and elsewhere, and have long-standing concerns about the threat to bighorn populations from domestic sheep grazing on public lands.  Petitioners have engaged in public outreach and education, advocacy with agencies, agency administrative processes, and litigation to promote the protection of bighorn sheep from domestic sheep grazing on public lands.  Petitioners have engaged with the Forest Service over the Wishbone allotment and other allotments on the Rio Grande National Forest, including by submitting comments and objecting to the Wishbone

decision, expressing concerns about domestic sheep grazing on this allotment due to the high risk

to bighorn sheep populations on and off the forest.  Petitioners have an interest in ensuring that

the Forest Service's grazing management complies with all applicable federal statutes and

regulations.

18.     Petitioners' interests in protecting and enjoying bighorn sheep on the Rio Grande

National Forest, particularly those herds near the Wishbone allotment, are being directly harmed

by Respondent's action.  Petitioners' above-described interests have been, are being, and unless

the relief prayed for is granted, will continue to be adversely affected by Respondent's violations

of law.

19.     Respondent U.S. FOREST SERVICE is an agency or instrumentality of the

United States, and is charged with managing the public lands and resources of the Rio Grande

National Forest in accordance and compliance with federal laws and regulations.

## LEGAL BACKGROUND

**National Environmental Policy Act**

20.     NEPA requires federal agencies to undertake a thorough and public analysis of

the environmental consequences of a proposed federal action by taking a "hard look" at the

action's consequences.  The statute's twin objectives are to (1) ensure that agencies consider

every significant aspect of the environmental impact of a proposed action, and (2) guarantee that

relevant information is available to the public to promote well-informed public participation.

21.     To accomplish NEPA's purpose, Federal agencies must prepare a detailed

environmental impact statement (EIS) for all major Federal actions significantly affecting the

quality of the human environment.  42 U.S.C. § 4332(2)(C)(i).  Environmental information must

be available to public officials and citizens before decisions are made and before actions are taken.  40 C.F.R. § 1500.1(b).

22.     Agencies may prepare an environmental assessment (EA) to assist them in determining whether an action will have significant effects that require preparation of an EIS. *Id.* § 1508.9.  An agency can avoid doing an EIS if it issues a Finding Of No Significant Impact (FONSI).  *Id.* §§ 1501.4(e), 1508.13.  An agency must do an EIS if the action *may* have any significant effect on the environment.

23.     NEPA regulations define significance in terms of context and intensity.  *Id.* § 1508.27.  Context refers to the scope of the proposed action, while intensity refers to the severity of the impacts.  *Id.*  Ten "intensity" factors help determine whether an agency action may cause significant impacts.  *Id.* § 1508.27(b).  These factors include: the degree to which possible effects are likely to be highly controversial; the degree to which possible effects are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects; and whether an action may have cumulatively significant effects when added to other related actions.  *Id.* § 1508.27(b)(4), (5), (6), (7).

24.     Both EAs and EISs must discuss a proposed action's direct, indirect, and cumulative effects.  Direct effects are caused by the action and occur at the same time and place, whereas indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  *Id.* § 1508.8.  Cumulative impacts are the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.  *Id.* § 1508.7.

25.     NEPA documents must contain high-quality information and accurate scientific

analysis; they must identify the methodology and scientific sources relied upon for the agency's conclusions; their discussion and analysis must be based on professional and scientific integrity; and they must reveal any incomplete or unavailable information and explain the relevance of the missing information to evaluating reasonably foreseeable significant adverse effects.  *Id.* §§ 1500.1(b), 1502.22, 1502.24.  Agencies must use the "best available scientific information" when assessing environmental impacts under NEPA.  *Lee v. U.S. Air Force,* 354 F.3d 1229, 1244 (10th Cir. 2004).

26.     An agency must prepare a supplemental NEPA analysis when significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts emerge, or when the agency determines that the purposes of NEPA will be furthered by doing so.  *Id.* § 1502.9(c)(1)(ii), (c)(2).  Supplemental NEPA is warranted when new information shows that the remaining action may affect the environment in a significant manner or to a significant extent not already considered.  The agency must take a hard look at the new information and provide a reasoned explanation for the information's significance or lack of significance when deciding whether to prepare a supplemental EA or EIS.

**National Forest Management Act**

27.     NFMA governs the Forest Service's management of the National Forests.  16 U.S.C. § 1600 *et seq*.  The statute established a two-step process for forest planning.  First, the Forest Service must develop, maintain, and revise Land and Resource Management Plans ("Forest Plans") for each national forest.  *Id.* § 1604(a).  The Forest Plan guides natural resource management activities forest-wide, setting desired conditions, objectives, and standards and guidelines for various forest resources, including wildlife.  Forest Plans must provide for

"diversity of plant and animal communities."  *Id.* § 1604(g)(3)(B).

28.     Once a Forest Plan is in place, site-specific actions are planned and evaluated by the Forest Service.  All site-specific decisions must be consistent with the broader Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

29.     The Rio Grande Forest Plan was adopted in 1996 under the 1982 NFMA regulations.  These regulations implemented NFMA's wildlife diversity provision by requiring that:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.  For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area.  In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (1999).

30.     The Rio Grande Forest Plan contains direction to fulfill these requirements.  The Plan has Forestwide desired conditions, objectives, and standards and guidelines that direct the agency to sustain viable populations of native wildlife species; assure that species whose viability is a concern survive throughout their range; protect, restore, and enhance habitat of Forest Service Sensitive species, which include bighorn sheep; manage habitat to allow species to disperse over large areas; and avoid disturbance of Sensitive species that might result in loss of population viability.

31.     The Plan also contains appendices that incorporated National and Regional direction from the Forest Service Manual related to population viability and Sensitive species.

This direction requires the agency to maintain viable populations of all native wildlife species in habitats distributed throughout their geographic range on National Forest lands.

## STATEMENT OF FACTS

### I. Disease Transmission from Domestic Sheep to Bighorn Sheep

32.     No dispute exists among scientists and wildlife biologists that domestic sheep can transmit a pathogen (*Mycoplasma ovipneumoniae*) to bighorn sheep that facilitates the onset of deadly pneumonia in most bighorns. Domestic sheep are immune to this pathogen but bighorns lack such immunity. Large die-offs within bighorn populations occur when the pathogen is transmitted from a domestic sheep to a bighorn sheep, and then that bighorn transmits it to other members of its herd. Most bighorn die-offs from pneumonia reduce herd sizes by 75-100%.

33.     For those female bighorns that are exposed to disease but do not die, they continue to carry the pathogen and transmit it to their lambs during pregnancy, causing the lambs to die within months of birth. Herds that have experienced die-offs often have low lamb recruitment for years following the disease outbreak. This keeps bighorn populations at low numbers, which makes them susceptible to extirpation from stochastic events (i.e., unpredictable events such as drought, flood, avalanche), inbreeding, or further disease impacts.

34.     Different strains of the *M. ovipneumoniae* pathogen exist, and bighorn herds that have experienced a die-off due to one strain may succumb to further disease if a different strain is transmitted to them. Repeatedly infected bighorn populations often fail to recover and grow to a viable size because high lamb mortality continues for decades even if some adults in the population persist. Most domestic sheep flocks carry the *M. ovipneumoniae* pathogen, particularly large flocks, and usually carry multiple strains of it. Other species may carry the

pathogen, such as goats or other ungulates, but it is not as prevalent as in domestic sheep.

35.     Scientists originally thought that transmission of the pathogen from domestic sheep to bighorns required direct physical contact between the species, but recent research indicates the pathogen can be transmitted through the air.  The risk of contact between these species is high when they are using the same range because they are closely related—within the same genus—and both species are gregarious.  Therefore, they seek each other out when in the same vicinity.  The danger of bighorns contracting the pathogen from domestic sheep is much greater than them contracting it from other species because of the attraction and similarity between the two sheep species.

36.     Although bighorn herds have home ranges where they spend most of their time, individual rams and ewes make forays outside of their home ranges when looking for mates or seeking out new or additional habitat.  Forays can occur miles away from the home range, with some bighorns travelling more than 20 miles.  It is common for young rams to make forays during the rut in the fall to look for mates, but forays can occur in other seasons as well.  These forays increase the risk of disease transmission if a bighorn contracts the *M. ovipneumoniae* pathogen from a domestic sheep during its travels and then returns to its herd or contacts another bighorn herd and passes on a new strain of the pathogen.

37.     Interactions between bighorn herds are even more common in meta-populations, which consist of multiple herds that are connected through frequent movement of bighorns between them.  This meta-population structure increases gene flow and genetic diversity among bighorn herds, but also increases the risk of disease transmission between herds.

38.     It is common for domestic sheep to stray from their band while on an allotment,

and they can survive on their own for weeks or months at a time.  Stray domestic sheep have been documented miles away from their allotment or remaining on an allotment for several months after the rest of the band had been removed.  It is common for domestic sheep to stray from their band when they are trailing to or from an allotment or between pastures within an allotment.  Sheep also scatter and stray when predators or storms startle them.  Stray domestic sheep pose a significant risk of disease transmission to bighorn sheep.

39.    Bighorn sheep experts have repeatedly stated that, because it is difficult to see foraying bighorn sheep or to prevent domestic sheep from straying, and these species will seek each other out, "best management practices" such as using extra herders and guard dogs, periodically counting domestic sheep, or hazing bighorn sheep away from domestic bands have not been effective at keeping the species separated on the range.  Experts agree that the only way to protect bighorn sheep is to provide many miles of spatial separation between the species.

**II.    Closures of Domestic Sheep Allotments to Protect Bighorn Sheep.**

40.    Due to the danger domestic sheep pose to bighorn sheep, numerous Forest Service allotments have been closed to protect nearby bighorn sheep populations, often as a result of court litigation.  After several groups filed a lawsuit in Idaho in 2007, the Forest Service closed domestic sheep allotments in Hells Canyon and along the Salmon River due to their threat to bighorn sheep populations.  When the livestock permittees challenged some of the closures, the U.S. District Court upheld them, finding that the decisions were well-supported by the science and bighorn sheep experts.  *Western Watersheds Project et al. v. U.S. Forest Serv.,* 2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007); *Western Watersheds Project et al. v. U.S. Forest Serv.,* 2007 WL 3407679, No. 4:07-cv-151-BLW (D. Idaho, Nov. 13, 2007).

41.     After doing an in-depth analysis about the risk of disease transmission to bighorn sheep, the agency closed more allotments on the Payette National Forest in Idaho that were determined to present a very high, high, or moderate risk to bighorn sheep.  The Forest Service had developed a "risk of contact" model for the analysis that assessed the risk of the two species coming into contact based on habitat, the location of bighorn home ranges, and the potential for bighorn sheep forays onto allotments.  The livestock industry challenged the Payette's analysis and decision but the U.S. District Court and the Ninth Circuit Court of Appeals both upheld them.  *Idaho Wool Growers Ass'n et al. v. Vilsack et al.,* 7 F. Supp. 3d 1085 (D. Idaho 2014), *aff'd* 816 F.3d 1095 (9th Cir. 2016).

42.     In a recent Idaho case, the petitioners here brought a lawsuit in 2017 over two Forest Service allotments in southeast Idaho that the agency's risk of contact model had shown were very high risk to bighorn sheep because of their proximity to the South Beaverhead Mountains bighorn population.  After a court injunction temporarily closed the allotments, the Forest Service extended that closure and it remains in effect.  *Western Watersheds Project et al. v. U.S. Forest Serv.,* 2017 WL 5571574, No. 1:17-cv-434-CWD (D. Idaho Nov. 20, 2017).

43.     The Bureau of Land Management (BLM) in Idaho has also closed grazing allotments to domestic sheep due to threats to bighorn sheep populations.  Initially, BLM refused to close an allotment that was adjacent to some of the high risk allotments on the Payette National Forest.  A court injunction in 2009 temporarily closed the allotment, and BLM extended that closure while it conducted a thorough analysis.  *Western Watersheds Project v. BLM,* 2009 WL 3335365, No. 4:09-cv-507-BLW (D. Idaho, Oct. 14, 2009).  The agency finished its analysis in 2017, which resulted in the permanent closure of that allotment and two others that BLM

determined were high or moderate risk to bighorn sheep in central Idaho.

44.     BLM has also closed three allotments in southeast Idaho near bighorn sheep populations, one in 2012 and two more in 2018, while it conducts an analysis of long-term management options.

45.     In Colorado, the Rio Grande National Forest and San Juan National Forest conducted risk assessments in 2010 for multiple domestic sheep allotments and closed areas that were assessed as high risk to bighorn sheep due to the threat of disease transmission.  Once the Forest Service's risk of contact model was available, the Rio Grande National Forest used that model to assess the risk of the Fisher-Ivy/Goose ("FIG") allotment near one of the Weminuche bighorn herds.  The FIG allotment consisted of multiple pastures, some of which overlapped the bighorn herd's core home range.  The Forest Service determined that use of each pasture—even pastures that did not overlap bighorn core home range—was a high risk to that bighorn herd and it closed the entire allotment in 2013.

46.     In 2015, the Rio Grande National Forest conducted a similar risk assessment for the Snow Mesa allotments, which were near the Central San Juan bighorn meta-population.   The Forest Service analyzed this group of three allotments using the risk of contact model, and rated each allotment as high risk.  The agency proposed to close the three Snow Mesa allotments due to their threat to the Central San Juan bighorn herds and instead, as described below, create a new allotment—called the Wishbone allotment—that would allow the same permittees to continue grazing their domestic sheep nearby.  The agency prohibited use of the Snow Mesa allotments after 2015.

47.     Federal grazing allotments in other states around the West have likewise been

closed to domestic sheep to protect bighorn populations.  Forest Service allotments in California,

New Mexico, and Wyoming have been closed to domestic sheep to protect bighorn sheep, either

through Forest Service actions or permittees voluntarily waiving their permits back to the agency

(in exchange for compensation).  These allotment closures have reduced the threat of disease for

numerous bighorn sheep populations across the West.

### III.    Central San Juan Bighorn Herd

48.    Bighorn sheep are a native species to Colorado but many herds in the state were

fully or nearly extirpated years ago due primarily to disease, overhunting, and habitat

fragmentation.  In order to save or increase herds, CPW transplanted bighorns into numerous

areas throughout the State.  The number of bighorns in the state has increased but it is still a

small percentage of historic levels.

49.    For management purposes, CPW has identified individual bighorn sheep herds as

well as larger herd complexes (or meta-populations) consisting of multiple herds that frequently

interact.  The Central San Juan bighorn meta-population (RBS-22) occurs on the Rio Grande

National Forest around the town of Creede, Colorado.  It consists of four individual herds:  the

San Luis Peak herd (S22), the Bellows Creek herd (S36), the Bristol Head herd (S53), and the

Rock Creek herd (S52).

50.    CPW has designated the largest, highest priority meta-populations as Tier 1 or

Tier 2 Core Populations, where Tier 1 populations are large populations (>100 animals)

consisting of one or more interconnected herds that have received few, if any, transplanted

bighorns, and Tier 2 populations are slightly smaller (>75 animals) with interconnected herds

that may have received transplanted animals.  CPW designated the Central San Juan meta-

population as a Tier 2 Core Population because, although it had about 260 animals, three of its four herds had received numerous transplanted animals.

51.     Other populations surround the Central San Juan bighorn herds, such as the Weminuche population to the south (RBS-20), the Natural Arch/Carnero population to the east (RBS-26), and the San Juan West population to the west (RBS-21). Most of these populations consist of multiple herds that interact. *See* Figure 1.



Figure 1:  Map showing bighorn meta-populations (i.e. RBS-22) and the individual herds within meta-populations (i.e. S22, S53, S36) in relation to the Wishbone allotment and Rio Grand National Forest. CPW has not mapped the unit boundary for the Rock Creek herd within RBS-22 but it occurs northwest of the San Luis Peak herd (S22).

52.     Habitat for the Central San Juan meta-population is comprised of 90% federal public land, with much suitable but unoccupied habitat present that would allow the herds to grow in size and expand in geographic range.  Suitable connected habitat between the four herds and between RBS-22 and other adjacent populations creates a high potential for movement and interaction between herds, making it likely that disease impacts to one herd will affect others.

53.     The Central San Juan meta-population had close to 400 animals before disease die-offs occurred in the 1990's.  Each of the four herds experienced die-offs in the 1990's or 2000's and has continued to have low lamb recruitment in recent years. Each remains below its historic size, with the most recent estimates at 90 animals in the San Luis Peak herd, 80 animals in the Bellows Creek and Bristol Head herds, and just 5 animals in the Rock Creek herd.  The San Luis Peak herd is the only one of the four that is indigenous; the rest have been augmented with transplants.

54.     CPW has collected telemetry data on three of the Central San Juan herds since early 2016.  Nine animals in the Bristol Head herd, eight animals in the Bellows Creek herd, and eleven animals in the San Luis Peak herd have data from radio telemetry collars.  CPW also has visual observations of bighorns from these and surrounding herds.  *See* Figure 2.



Figure 2:  2016-2018 bighorn telemetry locations for Central San Juan herds and other bighorn observations in relation to Wishbone pastures.

55.     For the Central San Juan herds, the telemetry data showed more extensive movements both within and outside of their home ranges than previously known.  Bighorns were documented travelling fifteen miles or more.  They moved between herds within RBS-22 and entered ranges of herds from neighboring meta-populations, such as S-33 from the San Juan West meta-population and S-16 from the Weminuche meta-population.

56.     The telemetry data provided further information, including that bighorns made transitory movements through forested areas (which are considered non-suitable habitat for

bighorns) in winter, spring, and summer to move between high alpine areas and lower elevation areas; the San Luis Peak herd uses a much larger wintering area than previously documented; bighorns from the Bristol Head and Bellows Creek herds frequently went down to and sometimes crossed Highway 149 during all times of year; and bighorns from these herds made other unexpected movements to new locations.

57.     Data collection from these telemetry collars is continuing, and CPW stated that a full analysis of results is anticipated in 2019.   Because only a sample of bighorns from each herd was collared (10%-13%), these data do not show the full extent of movements and habitat use by each herd.

58.     CPW has stated that disease is the biggest threat to the Central San Juan herds, and foraying bighorn sheep or stray domestic sheep are the likely path of transmission.  One contact with a domestic sheep could affect RBS-22 for decades due to poor lamb survival and recruitment that follows a disease event.  In fact, CPW tested fifteen of the collared Central San Juan bighorns and ten were positive for *M. ovipneumoniae,* meaning they are carrying at least one strain of the pathogen, which is likely responsible for the poor lamb recruitment in this meta-population.

**IV.     The Forest Service's Wishbone EA and Decision**

59.     Subsequent to the risk assessment that showed the Snow Mesa allotments were high risk to the Central San Juan bighorn meta-population, the Rio Grande National Forest issued a draft EA in 2015 proposing to close the allotments.  After receiving public comments on the draft EA, the forest decided to create a new allotment near-by, called the Wishbone allotment, to allow those same domestic sheep to continue grazing on the forest.  The Forest

Service allowed the Snow Mesa permittees to use the Wishbone allotment during the 2016 and 2017 grazing seasons on a trial basis while it analyzed the new allotment.

60.     The Wishbone allotment consists of seven pastures.  The Crystal and Shallow pastures are the largest and highest elevation pastures, with the Crystal pasture going up to 11,000 feet elevation.  These two high elevation pastures would be grazed during the middle of the June to September grazing season—i.e. mid-summer.  The other five Wishbone pastures are smaller, lower elevation parcels that occur near Highway 149 and are separated by long distances.  The farthest pasture to the east is the Coller pasture, which is within the Coller State Wildlife Area.  The Forest Service coordinated with CPW to incorporate this State land into the Wishbone allotment.  The South River pasture is farthest to the west, and is just ¼ mile from the previously closed FIG allotment.  These five smaller parcels would be grazed at the beginning and end of the grazing season.  The domestic sheep would have to trail close to twenty miles between pastures during the course of the grazing season, including about ten miles between the East Bench and Coller pastures (*See* Figure 3 below).

61.     The Forest Service amended the risk assessment for the Snow Mesa allotments to include the new Wishbone allotment.  Compared to the Snow Mesa allotments, the Wishbone pastures were farther from the core home range of the San Luis Peak bighorn herd, but they were closer to the core home ranges of the Bristol Head and Bellows Creek herds.  *See* Figure 3.



Figure 3: Bighorn core herd home ranges (CHHR), summer range, and overall habitat for the Bristol Head (S53), Bellows Creek (S36) and San Luis Peak (S22) herds in relation to Snow Mesa and Wishbone allotments.

62.     The Forest Service used the risk of contact model to assess the risk of the Wishbone allotment and determined that it was high risk for the Central San Juan bighorn meta-population.  Rather than prohibit use of the allotment due to the high risk rating, as it did with the near-by Snow Mesa and FIG allotments, the Forest Service described six "uncertainties" related to use of the model with the Wishbone allotment, and used these uncertainties and other assumptions to assert that the Wishbone allotment was actually moderate risk to the bighorn population, not high risk.  It stated that moderate risk was "acceptable."

63.     The risk assessment lowered the risk from high to moderate because it claimed

that: (1) no direct overlap existed between the allotment and core home range for any of the

bighorn herds; (2) the herds near the allotment usually move to higher elevations in summer,

away from the Wishbone pastures; (3) the Wishbone allotment has less overlap between bighorn

habitat and domestic sheep range than the Snow Mesa allotments; (4) the bighorn foray rates

used in the risk of contact model are likely higher than what is occurring on the ground because

the model used a longer grazing season; (5) "best management practices" will be more effective

with this allotment because it is easier to monitor and manage than the Snow Mesa allotments

given the accessibility and high visibility of the pastures along Highway 149; (6) habitat

fragmentation such as Highway 149, the Rio Grande River, and subdivisions will keep bighorns

separated from the allotment; and (7) CPW concurred that the Wishbone allotment was lower

risk than the Snow Mesa allotments.

64.     The Forest Service issued a revised draft EA in March 2017 that proposed

closing the Snow Mesa allotments and grazing the Wishbone allotment.  It accepted public

comment on the revised draft, issued a final EA in November 2017 that contained the same

proposed action, and accepted objections on the final EA.  Petitioners as well as the permittees

submitted comments and objections.

65.     Public comments and objections disputed many of the Forest Service's

assumptions used to lower the risk rating for the Wishbone allotment.  They noted the very close

proximity of the bighorn home ranges to the allotment, and that the Forest Service

underestimated the likelihood of contact by ignoring the high potential for stray domestic sheep

and the attraction of the species to each other.  The comments and objections pointed out that

state and federal agency documents and the new telemetry data undercut many of the agency's assumptions about habitat use and movement of animals in these herds.  They also refuted the agency's assertions that foray rates used in the risk of contact model were not representative and that "best management practices" would prevent contact between the species.  Finally, the objections pointed out that the Forest Service did not consider the potential for disease transmission to adjacent bighorn herds or the increased risk to the Central San Juan meta-population if it expanded in size or range.  Most of the comments and objections agreed that the Wishbone allotment created a very high risk of disease transmission to bighorns, and the Forest Service's reasons for claiming otherwise were flawed and unsupported.

66.     Nevertheless, the Forest Service signed the Decision Notice and Finding of No Significant Impact on March 23, 2018.  The decision authorized use of the Wishbone allotment by 1000 domestic ewes with lambs from June 15 to September 1 each year.

67.     The DN/FONSI laid out five factors, similar to those stated in the risk assessment, to justify changing the risk rating for the Wishbone allotment from high risk to bighorn sheep to moderate risk.  These factors were:  (1) the grazing season on the Wishbone allotment is shorter than the season used in the risk of contact foray modeling; (2) suitable bighorn habitat is disconnected and fragmented so bighorns are less likely to disperse across the landscape than what the model portrays; (3) there is limited overlap between summer bighorn habitat and domestic sheep range on the allotment pastures; (4) most bighorns from these herds move to higher elevations in summer so away from the Wishbone allotment; and (5) best management practices will reduce the risk further and mitigate for the gregarious nature of the species.

68.     The Forest Service's statements about habitat use and movement of these

bighorns were based on incorrect and outdated assumptions.  For instance, CPW had sent the

Forest Service reports and emails about the recent telemetry data that showed movements of

these bighorns were much greater than previously known and the animals often travelled outside

of their home ranges.  Long movements—fifteen miles or more—were common and occurred

during all seasons; these animals often moved through non-suitable habitat; and they transitioned

between high elevation and low elevation areas in spring, summer, and fall.  Bighorns moved

between herds and into ranges of other meta-populations such as Weminuche and San Juan West

populations.  Bighorns were found close to the Wishbone pastures and trailing routes more often

than assumed, including during the grazing season.  And they crossed Highway 149 and moved

through subdivisions.  This new information was based on just two years of telemetry data and a

small fraction of the animals in each herd; the full extent of habitat use by these herds is likely

much greater than even this data showed.

69.     In sum, the Forest Service underestimated the movements of these bighorn sheep

within and outside of their home ranges, which led to incorrect assumptions about their use of

habitat near the Wishbone allotment.  Despite knowing that the telemetry data existed and

seemed to undercut many of these assumptions, the agency did not obtain and analyze the data

before signing the DN/FONSI.  By ignoring this data, the agency failed to adequately assess

baseline conditions necessary for its analysis of environmental impacts.

70.     The DN/FONSI also responded to the issues raised by objectors about risk of

disease transmission to neighboring bighorn herds, and the increased risk to the Central San Juan

meta-population if it increased in size and geographic range.  First, the Forest Service claimed

that the risk to bighorn herds to the west, east, and south of the Central San Juan meta-population

was too low to warrant analysis because those herds were far away from the Wishbone allotment and were unlikely to come into contact with domestic sheep from that allotment.  The agency failed to consider the risk of Central San Juan bighorns getting disease from domestic sheep using the Wishbone allotment and then transferring it to neighboring bighorn herds.  Agency documents and the new telemetry data confirmed that bighorns from the Central San Juan herds move into ranges of adjacent meta-populations and likely interact with those herds.  Past observations also showed bighorns from the Weminuche meta-population very close to the South River pasture of the Wishbone allotment.  These facts show the Wishbone allotment could affect neighboring bighorn herds from the Weminuche, San Juan West, or Natural Arch populations.

71.     Next, the Forest Service dismissed the issue of the Central San Juan meta-population increasing in size and range, which would increase the risk of those bighorns contacting domestic sheep, by stating that CPW would address that circumstance.  CPW's objective for this meta-population is a larger size and geographic range, and it admitted that the risk of contact with domestic sheep would increase as the Central San Juan bighorn population grows.  Instead of considering that in its NEPA analysis, the Forest Service stated that CPW will be the entity that addresses changes in risk of contact due to bighorn sheep population expansion.  By disregarding the issues of risk of disease transmission to adjacent herds and increased risk of contact with domestic sheep as the Central San Juan herds grow, the Forest Service failed to consider reasonably foreseeable effects of grazing the Wishbone allotment.

72.     The Forest Service concluded in its FONSI that there would be no significant effects from the proposed action because none of the significance factors from the NEPA regulations applied.  The Forest Service dismissed the substantial controversy about the risk of

contact and disease transmission by stating that the EA and risk assessment discussed the effects and disclosed the rationale for considering the risk moderate.  It asserted that uncertainties about the risk of contact model and disease transmission did not rise to the level of highly uncertain effects or unique or unknown risks.  It also stated that the proposed action was not likely to establish a precedent for future actions because it applied only to the Wishbone allotment, and there would be no significant cumulative effects.

73.     Finally, the DN/FONSI contained a section on Forest Plan compliance.  With regard to the direction in the Plan about sustaining viable populations of wildlife throughout their range and protecting Sensitive species, the Forest Service claimed that it did not need to maintain *all* populations of bighorn sheep on the forest and thus the Central San Juan meta-population was expendable because other herds would persist.  Eleven individual herds occur on the forest but most have potential for contact with domestic sheep because grazing is authorized in the area.  Because of the interconnectedness of the Central San Juan herds with other herds, disease effects to Central San Juan herds would likely spread to other meta-populations on the forest.

74.     The DN/FONSI also stated that the proposed action would support continued existence of the Central San Juan meta-population because it has existed despite grazing the Snow Mesa allotments, and the Wishbone allotment was lower risk than Snow Mesa.   The Forest Service concluded that a moderate risk of contact with domestic sheep is acceptable because it will allow for maintaining a viable population of bighorn sheep.  The Forest Service did not discuss the definition of or criteria needed for a viable population nor how chronic disease and long-term poor lamb survival and recruitment affect viability.

**V.      Problems with Stray Domestic Sheep by Wishbone Permittees**

75.      The permittees for the Wishbone allotment have a history of management problems with their domestic sheep.  The Forest Service had documented the following problems by these permittees: a notice of noncompliance for management violations in 2011, including stray sheep left on a trailing route used for the Snow Mesa allotments; sheep found grazing outside of the allotment boundary in 2012; 25 stray sheep found near Creede one month after trailing off the Snow Mesa allotment in 2013; a stray sheep seen near Coller State Wildlife Area in November 2013; sheep discovered grazing in an area that had been closed to protect bighorns in 2014; two stray sheep left behind after trailing in 2015; and stray sheep left behind in the Shallow Creek area after the band trailed off the Snow Mesa allotments in multiple years.

76.      As noted above, the Forest Service allowed these permittees to use the Wishbone allotment in 2016 and 2017 on a trial basis.  In 2016, the agency authorized the permittees to use the Wishbone pastures from east to west but trailing young lambs the long distance between the Coller pasture and East Bench pasture proved to be unworkable.  In 2017, the Forest Service authorized use from west to east, which is the same use authorized in the Decision Notice.

77.      Significant problems with stray domestic sheep occurred in 2017.  Fifty-four stray sheep were found between September 15 and October 19, mostly near the trailing route between the East Bench and Coller pastures.  Seven of the sheep discovered were dead while the other 47 were alive.  Stray sheep were discovered on the following dates:  September 15 (6 sheep), September 20 (14 sheep), September 26 (30 sheep), September 26 (1 sheep), September 28 (1 sheep), October 3 (1 sheep), October 19 (1 sheep).   Many of these strays were left behind for a week or more after the remainder of the band trailed off the allotment on September 20 despite

being in areas near Highway 149.

78.     In the permittees' objections to the Final EA for the Wishbone allotment, they expressed concern about their ability to manage domestic sheep on the allotment based on the trial use in 2016 and 2017.  They noted that the allotment does not have enough forage to support the permitted number of sheep, particularly in dry years; using multiple small pastures is harder to manage and increases the risk of straying as well as overuse; and terrain on the South River, Shallow and Crystal pastures makes it harder to control and manage the sheep in those areas.

79.     The Colorado Wool Growers Association (CWGA) also objected to the Wishbone Final EA, reiterating the difficulty of managing sheep on the allotment.  CWGA stated that the problems in the 2017 season make it "apparent that the allotment is not a workable option for the permittees."  The new grazing patterns, difficult terrain, and poor forage quality conditions "greatly increase the management responsibilities for the permittees, and significantly contribute to problems such as increased strays, and difficulty in locating and herding strays."

80.     The significant problems with sheep straying from the Wishbone pastures in 2017 and the warnings of the permittees and CWGA about the difficulty managing this allotment did not deter the Forest Service from relying heavily on "best management practices" to support reducing the risk of the Wishbone allotment to bighorn sheep from high to moderate and signing the Decision Notice and Finding of No Significant Impact.

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT

81.     Petitioners reallege and incorporate by reference the preceding paragraphs.

82.     This first claim for relief challenges the Forest Service's violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, in failing

to prepare an EIS prior to issuing the Decision Notice authorizing the Wishbone sheep allotment, and failing to undertake a thorough and objective assessment under NEPA of the direct, indirect, and cumulative effects of grazing the Wishbone allotment that incorporates all relevant data.

83.     First, the Forest Service violated NEPA by failing to prepare an EIS before authorizing the Wishbone allotment because grazing domestic sheep on the allotment may have significant effects.  The Forest Service's decision to create the allotment and authorize domestic sheep use on it has the potential to cause disease in multiple bighorn sheep herds, and implicates various "intensity" factors under NEPA.

84.     The action's effects are highly controversial because a significant dispute exists about the size and extent of the risk to bighorn sheep from grazing the Wishbone allotment.  40 C.F.R. § 1508.27(b)(4).  The effects of the action are also highly uncertain due to the various uncertainties about the risk of contact with domestic sheep and risk of disease transmission to bighorn sheep; and the risk of disease transmission is a unique risk.  *Id.* § 1508.27(b)(5).   The action may establish a precedent for future actions with significant effects if the Forest Service continues to use similar assumptions to lower the risk rating of allotments and authorize their use when they present a danger to bighorn sheep.  *Id.* § 1508.27(b)(6).  And the action may have cumulatively significant effects when added to other domestic sheep grazing on or near the Rio Grande National Forest that threatens additional bighorn populations.  *Id.* § 1508.27(b)(7).

85.     Second, the Forest Service's analysis in the EA and DN/FONSI regarding the threat to bighorn sheep was flawed in numerous ways, including by: (1) failing to consider telemetry data on the Central San Juan bighorn herds and other near-by herds collected prior to the DN/FONSI, which was the best available scientific information on movement and habitat use

of these bighorn sheep herds; (2) making assumptions in the EA and DN/FONSI about the risk of contact between domestic sheep grazing the Wishbone allotment and the Central San Juan bighorn herds that were unsupported by scientific and factual evidence; and (3) inadequately analyzing the risk of the Wishbone allotment to bighorn herds adjacent to the Central San Juan meta-population, and dismissing the need to consider effects of the Wishbone allotment if the Central San Juan meta-population increases in size or geographic range.

86.     These flaws in the EA violated NEPA in the following ways:

a.     Failing to take a "hard look" at all direct, indirect, and cumulative impacts of the proposed action along with other past, present, and future actions.

b.     Failing to insure that environmental information was available to the public before the decision was made, that the information was of high quality, and that the scientific analysis was accurate.

c.     Failing to insure the professional integrity, including the scientific integrity, of the discussions and analyses in the EA and reveal incomplete or unavailable data.

d.     Making assumptions and conclusions that were not supported by the best available scientific and factual information.

e.     Failing to adequately and accurately assess baseline environmental conditions critical for analyzing the impacts of the proposed action.

87.     These flaws violate NEPA and its implementing regulations.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.22, 1502.24, 1508.7, 1508.8.

88.     Third, the Forest Service is violating NEPA by failing to complete a supplemental

NEPA analysis that considers telemetry data and analysis for the Central San Juan bighorn herds that post-dates the DN/FONSI.  The telemetry data is significant new information that is very relevant to assessing the impacts of grazing the Wishbone allotment, and analyzing this data would further the purposes of NEPA.  40 C.F.R. § 1502.9(c)(1)(ii), (c)(2).

89.     Accordingly, the Wishbone EA and DN/FONSI are arbitrary, capricious, an abuse of discretion, not in accordance with NEPA, and issued without observance of procedure required by law, and therefore are actionable pursuant to the APA, 5 U.S.C. § 706(2)(A), (D). The agency's decision not to prepare supplemental NEPA that incorporates telemetry data collected since the DN is also arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL FOREST MANAGEMENT ACT**

90.     Petitioners reallege and incorporate by reference the preceding paragraphs.

91.     This second claim for relief challenges the Forest Service's violations of the National Forest Management Act, 16 U.S.C. § 1600 *et seq*., and NMFA's implementing regulations, in authorizing domestic sheep grazing on the Wishbone allotment that threatens the viability of bighorn sheep populations on the Rio Grande National Forest.

92.     Under NFMA, the Forest Service must act consistently with direction in the applicable land management plan when authorizing any project or activity.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.  The Forest Service has violated NFMA by acting inconsistently with direction in the Rio Grande Forest Plan regarding protecting Sensitive species and sustaining viable populations of wildlife on the forest.  It first improperly concluded it does not need to maintain the Central San Juan bighorn meta-population to comply with this direction.  Then, it improperly concluded that grazing the Wishbone allotment would allow for viability of the

Central San Juan meta-population because the risk to that population was only moderate.

93.     Accordingly, the Decision Notice authorizing the Wishbone sheep allotment is arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA, and therefore is actionable pursuant to the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

A.      Adjudge and declare that the Wishbone sheep allotment EA and DN/FONSI were arbitrary, capricious, an abuse of discretion, contrary to law, and/or issued without observance of procedure required by law under the judicial review standards of the APA, 5 U.S.C. § 706(2).

B.      Reverse and set aside the Wishbone sheep allotment EA and DN/FONSI, as required by 5 U.S.C. § 706(2), and order the Forest Service to comply with the requirements of NEPA and NFMA before authorizing grazing on the Wishbone sheep allotment.

C.      Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Petitioners.

D.      Award Petitioners their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. and/or all other applicable authorities.

E.      Grant such further relief as the Court deems just and proper in order to provide Petitioners with relief and protect the public interest.

Dated:  January 24, 2019      Respectfully submitted,


s/ Lauren M. Rule
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave, Suite B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org

s/ Maya L. Kane
Maya L. Kane
Kane Law, LLC
10 Town Square, #422
Durango, CO 81301
(970) 946-5419
mayakanelaw@gmail.com


Attorneys for Plaintiffs