IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 19-cv-00208-DDD

WILDEARTH GUARDIANS; and
WESTERN WATERSHEDS PROJECT,

  Petitioners,

v.

U.S. FOREST SERVICE, a federal agency of the United States Department of Agriculture,

  Respondent,

and

WAYNE BROWN;
JERRY BROWN;
THE COLORADO WOOL GROWERS ASSOCIATION;
J. PAUL BROWN; and
THE COLORADO FARM BUREAU FEDERATION,

  Respondent-Intervenors.

---

## ORDER ON APA PETITION

---

 Petitioners are non-profit organizations dedicated to conservation of public lands in the American West. They bring this case to challenge the U.S. Forest Service's decision authorizing the use of certain public lands in Colorado for domestic sheep grazing. Petitioners argue that the U.S. Forest Service violated several federal statutes in making this decision which allegedly places wild sheep populations at undue risk of disease transmitted by the domestic sheep. They therefore seek vacatur of the Service's decision. But because the Service did not act arbitrarily and capriciously in allowing such grazing, petitioners' request is denied.

## BACKGROUND

### I.   Domestic and Bighorn Sheep

For nearly 100 years, the Forest Service has authorized livestock grazing in the Rio Grande National Forest in southwestern Colorado. This includes grazing of domestic sheep. But domestic sheep pose risks to the native, wild bighorn sheep populations. WA1206.[1] In fact, disease transmission from native sheep to wild bighorn sheep, particularly pneumonia-causing bacteria such as *Pasteurella*, may be the "primary factor limiting bighorn sheep populations." *Id.* Some wild herds have suffered large die-offs due to such disease transmission, and some herds in the Rio Grande National Forest are currently afflicted with pneumonia caused by a bacterium common to domestic sheep. *Id.* Bacteria, including *Pasteurella*, can also pass from mother to lamb, leading to reduced lamb survival, causing long-lasting negative effects on a herd. Transmission of pneumonia from domestic sheep to bighorn sheep requires "very close contact" of fewer than 60 feet. *Id.* While the scientific literature "supports the potential" for disease transmission from domestic to wild populations, not all bighorn pneumonia die-offs are attributable to domestic sheep. WA03964.

In large part due to these concerns about disease, the Forest Service has designated bighorns as a "Sensitive Species," meaning that there is concern for the long-term viability of the bighorns in the Rocky Mountain region. WA03963. To reduce the potential for disease transmission, the Forest Service tracks various bighorn herds and seeks to avoid allowing domestic herds to contact the wild herds. WA1316. To this end,

---

[1] The court has followed the parties' convention of citing to the administrative record as labeled. *See* Docs. 22, 23.

since 2010, the Forest Service has vacated twenty domestic sheep grazing "allotments." WA05677.

## II.   The Wishbone Allotment, Snow Mesa Allotment, and Related Wild Herds

In 2012, the Forest Service began analyzing the potential impacts of domestic sheep grazing on four existing allotments. WA5219-20. Due to the close proximity of one of those allotments—the Fisher-Ivy/Goose allotment—to wild herds (within 1-2.5 miles), the Forest Service deemed the allotment "high risk," vacated that allotment, and disallowed domestic grazing on it. WA1806-18. Two years later, the Forest Service turned to another set of allotments: the Snow Mesa allotments. WA2116. The Forest Service similarly found that the continued grazing on these allotments presented a "high risk" of disease transmission. WA2299, 2325, 2330. But instead of just vacating those allotments, the Forest Service proposed both vacating those allotments and replacing them with a new allotment: the Wishbone Allotment. WA2693. That allotment has three bighorn sheep herd neighbors: the Central San Juan Population, the Weminuche Population, and the San Juan West Population. *See* Doc. 36 at 10-11. The herds' proximity to the Wishbone Allotment ranges from four (or perhaps fewer) to twelve-plus miles. WA03979-80, 5673-74, 05640.

## III.   The Forest Service's Environmental Assessment and Finding of No Significant Impact Regarding the Wishbone Allotment

To assess the risk that domestic sheep would intermingle with wild herds—and therefore potentially spread disease to the wild herds—if allowed to graze on the Wishbone Allotment, the Forest Service used a "four-step viability analysis process" and a "Risk of Contact Tool." WA1317, 4057-60, 3872. The Risk of Contact Tool or Risk of Contact Model is a computer model that takes various inputs—including

estimated core herd ranges, "ram and ewe foray rates, a summer source habitat model representing suitable summer habitat, and domestic sheep allotment boundaries" to estimate the likelihood that domestic and wild sheep will cross paths. WA03988. According to the Forest Service, this tool is but one of a number used to assess the risk of comingling. *Id.* And the model has some deficiencies, according to the Forest Service, including an inability to account for existing "on the ground" knowledge of particular herds' grazing patterns. WA3989-98.

Based on that computer model alone, the risk of comingling was deemed "high" for purposes of the Wishbone Allotment. But to fill in some of the gaps that the model may miss, the Forest Service relied on its "qualitative" assessment of "local factors." These factors, at least for purposes of the Wishbone Allotment, included:

- The temporal separation due to the domestic sheep grazing duration, including through limitations on the number of days allowed for domestic grazing on the Wishbone Allotment;

- Spatial separation through habitat fragmentation and landscape configuration, including due to the fact that bighorn and domestic populations were separated by a highway and a river;

- Spatial separation due to limited overlap between the bighorn summer source habitat and the domestic sheep capable range. This is due in part to the computer model's purported inability to account for "finer scale information" of where exactly domestic sheep would graze within the wider allotment;

- Spatial separation due to bighorn sheep seasonal movements, based in part on local knowledge of the particular bighorn

herds at issue—information not accounted for by the computer model; and

- "Project design features," including active monitoring of the grazing herds to avoid stray sheep from venturing toward wild herds.

WA5668-71.

Based on these additional considerations, the Forest Service found that the Wishbone Allotment presented a "moderate," rather than a "high," risk of disease transmission and decided to approve the allotment. WA 4033, 5668. Approval of this allotment amounted to a compromise between the lowest risk alternative (simply banning grazing on the Snow Mesa allotments) and the highest risk alternative, which, according to the Forest Service, was to do nothing at all and to allow continued grazing on the Snow Mesa allotments. WA4040-41. The Forest Service therefore concluded that the Wishbone Allotment plan allowed for the "continued long-term persistence" of local bighorn sheep "while also providing public land grazing opportunities for local livestock producers." WA4041.

Given these findings, the Forest Service issued a draft Environmental Assessment and Finding of No Significant Impact for public review and comment. Those drafts attracted numerous objections, however. WA5448-611. One organization disputed the Forest Service's assessment that the five aforementioned "local factors" would reduce the risk of disease spread. WA5447-49. Another group maintained that the Risk of Contact Model—which concluded that the risk of contact was "high"—should have formed the exclusive basis for the Forest Service's decision and that the reliance on local factors was "arbitrary." WA5565-69. Nevertheless, the Forest Service issued its final Environmental Assessment (the "Assessment") and Finding of No Significant Impact (the "Finding")

in March 2018. WA5660. A few months later in October 2018, petitioners sought and obtained additional bighorn telemetry data from the state of Colorado. Doc. Doc. 35 at 9.

## DISCUSSION

### I.   NEPA Background

"In NEPA, Congress codified rules designed to focus both agency and public attention on the environmental effects of proposed actions and thereby facilitate informed decisionmaking by agencies and allow the political process to check those decisions." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015) (cleaned up). "The Act does so in two ways: First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* (cleaned up). "The Supreme Court has made clear that 'NEPA itself does not mandate particular results, but simply prescribes the necessary process.'" *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

"Under NEPA, federal agencies must prepare an Environmental Impact Statement ('EIS') whenever they undertake 'major Federal actions significantly affecting the quality of the human environment.'" *Id.* (quoting 42 U.S.C. § 4332(C)). To determine whether an agency action will have such a "significant" effect, the agency first generates an Environmental Assessment ("EA"). *Id*; 40 C.F.R. § 1501.3 (effective to September 13, 2020).[2] "Distilled to its essence, the EA is a rough-cut, low-budget

---

[2] After this case was filed, the Council for Environmental Quality issued substantially different federal regulations governing NEPA. *See generally*, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 FR 43304-01, 2020 WL

EIS designed to show whether a full-fledged EIS—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." 784 F.3d at 690 (cleaned up).

If, in the horribly acronym-laden jargon of NEPA law, the EA leads the agency to conclude that no EIS is required, the agency then creates a "finding of no significant impact" or "FONSI." *Id.* at 682. After preparing the FONSI, the agency may move forward with the proposed action. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1251 (10th Cir. 2019). "Because NEPA provides no private cause of action, challenges to an EA or FONSI must be brought under the Administrative Procedure Act (APA), which instructs us to review whether an agency's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A)." *Id.* (cleaned up).

"An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." 784 F.3d at 691 (internal quotation and citations omitted). "As a general principle, the judiciary's role in the NEPA context is merely to ensure that the federal agency takes a hard look at the environmental consequences of its actions." *Id.* (internal quotation omitted). The petitioners bear the burden of proof to show that the decision violated the APA, and there is a "presumption of validity" for the decision. *Id.* Aside from the procedural requirements, however, NEPA and the APA also impose a substantive requirement: if the conclusion that there would be no

---

4001797 (July 16, 2020). Those new regulations govern "any NEPA process begun after September 14, 2020," but also allow an agency to "apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (effective September 14, 2020). Because this case and all relevant agency decisions in this case predate the effective date of those new regulations, the Court has applied the regulations in effect prior to September 14, 2020 to the relevant agency actions here.

significant effect on the environment represents a "clear error of judgment," the court must reverse it. *Id.*

## II.   Motion to Strike

As a threshold issue, petitioners have moved to strike certain documents filed as a supplement to the administrative record. Doc. 24. That included a "Supplemental Information Report," or SIR, on telemetry data conducted by the Service in 2019, after the commencement of this lawsuit and after the Service made its Wishbone Allotment Assessment and Finding.

"Generally, the agency's action must be reviewed on the basis articulated by the agency and on the evidence and proceedings before the agency at the time it acted." *Sierra Club v. Fed. Highway Admin.*, 2018 WL 1695402, at *3 (D. Colo. Apr. 6, 2018) (quoting *Am. Mining Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985)). But in NEPA cases, "courts repeatedly endorse SIRs as a method for analyzing new circumstances and determining whether they reveal significant new impacts requiring formal NEPA review." *ForestKeeper v. La Price*, 270 F. Supp. 3d 1182, 1224 (E.D. Cal. 2017) (collecting cases). Such supplemental reports are appropriate where the information reviewed in the report was "new and unknown" at the time a prior agency action was taken. *Id.* And an agency need not start the environmental assessment process anew with every change in a project. *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997).

As discussed further below, the Service did not act arbitrarily or capriciously when it issued its Assessment and Finding based on the information before it at the time. I have come to this conclusion based on the information provided in the administrative record as it existed when the assessment was made and without relying on the Supplemental Information Report. The Service also did not act arbitrarily or capriciously

by failing to consider the additional telemetry data in March 2018 that was later addressed in that supplemental report. Given all this, there is no need to strike the supplemental information from the record, but the court will also deem petitioners' additional documentation, including comments on the supplemental report, a part of the record as well. *See* Docs. 28-1, 28-2. The motion to strike is therefore denied.

## III. The Wishbone Assessment and Finding Were Not Arbitrary or Capricious

Petitioners argue that the Forest Service's Environmental Assessment and Finding of No Significant Impact were arbitrary and capricious for three main reasons: the Forest Service "relied on unsupported assumptions;" the Forest Service failed to examine and disclose relevant data, including telemetry data held by the state of Colorado; and the Forest Service "failed to consider all effects of the action." Doc. 33 at 20-31.

### A. Reliance on "Local Factors"

As to the first argument, petitioners argue that the Forest Service should have relied exclusively on the computer model—which indicated that the plan created a "high" risk of exposure between domestic and wild herds—rather than to rely on the additional "local factors" to conclude that the risk of exposure was "medium." According to petitioners, this reliance on local factors amounted to unsupported, ad hoc rationalizations for the plan.

Petitioners' broader suggestion that the Risk of Contact computer model is the end-all-be-all for assessing the risk of contact between domestic and wild herds is unpersuasive. As the scientific literature indicates, such models may fail to "account for habitat connectivity as well as habitat type." WA4475. And, as at least one other court has

acknowledged, the risk of contact model is but "one data point for ana-lyzing the risk of disease transfer" that has various limitations. *WildEarth Guardians v. Bail*, 2021 WL 1550567, at *4 (E.D. Wash. Apr. 20, 2021). The Forest Service's decision to rely on other factors not cap-tured by the model, standing alone, was not arbitrary and capricious.

Nor were the findings based on consideration of those additional fac-tors. First, the Service considered the fact that grazing in the Wishbone Allotment would occur during a 78-day period in the summer, less than half of the assumed grazing season inputted into the computer model. WA5668. Petitioners counter that the Forest Service should have run the model for that shorter period in the first place. Doc. 39 at 12. But the cited user guide suggests that the model can only be run for "winter" and "summer" seasons—presumably 180 days each or thereabouts. There is no indication that the model could be run granularly down to a 78-day period between June and September. It was therefore reasonable to assume that the model's initial results, based on a 180-day period, overstated the risk of contact. And as the Service notes, telemetry data supported its finding that the bighorn migrations would not overlap with the time when domestic sheep would graze the Wishbone allot-ment. WA4142-43, 4246-47. While there may have been some debate re-garding the exact positioning of wild herds during the proposed 78-day grazing season, that alone does not render the Service's reliance on this factor to be arbitrary, capricious, or illogical.

Second, the Service downgraded the model's risk assessment because it failed to analyze the effect of "habitat fragmentation," including by highways and rivers. Those obstacles, the reasoning goes, would at least reduce the likelihood of contact between herds. And as the Service notes, the Rio Grande River flows highest, or near its highest, during the pe-riod when the domestic sheep would graze the Wishbone Allotment.

WA5668-69. Petitioners respond that there is some data suggesting that bighorns do cross that river and do cross the highway. But the Service did not conclude that these habitat obstacles *precluded any* contact between the herds, only that they would reduce the likelihood. That finding was not irrational, arbitrary, or capricious.

Third, the Service found that there was only a 34% overlap between the bighorn summer source habitat and the domestic sheep range on the Wishbone Allotment. Petitioners do not dispute this finding but argue that the Service needed to do a more granular pasture-by-pasture analysis to be able to rely on this factor to reduce the risk assessment. Petitioners provide no authority for such a requirement, nor do they explain in detail why an allotment-level assessment would be arbitrary or capricious. This argument, therefore, is unpersuasive.

Fourth, the Service concluded that there would be further spatial separation of the herds because the migration of local herds were fairly predictable and did not overlap with the grazing season. WA5670. In particular, the Service found that the local wild herds moved away from the Wishbone Allotment (including to higher elevations) during the summer when domestic sheep would be allowed to graze. Petitioners quibble with some of the underlying data supporting this finding, including the suggestion that "a single year of data is not sufficient to show a predictable pattern." Doc. 39 at 16. But it was not unreasonable for the Service to conclude that local herds at least *tend to* migrate to higher-elevation pastures away from the Wishbone Allotment when domestic sheep will be grazing based on telemetry data and a survey of one such herd. WA 3651-59, 3770-78, 5374-75.

Finally, the Service found that certain "design features"—including limiting grazing for particular pastures and requiring two herders for

the allotment to limit strays—would further reduce the risk of contact. WA3595-97. Petitioners argue that intervenors did not comply with similar design features in years past, leading to incidents of stray sheep. Doc. 39 at 17-18. But prior noncompliance or incomplete compliance does not render reliance on this factor arbitrary and capricious, and the Service has made efforts to shore up compliance.

To summarize, the Service's reliance on these five local factors to conclude that the risk of contact would be reduced to "moderate" was not arbitrary or capricious. Petitioners finally argue that the Service failed to explain *how* these factors reduced the risk from "high" to "moderate." But the record shows that the Service explained in detail why each factor reduced that risk. There is always some level of subjectivity in a relative "risk rating," but any such subjectivity does not render such a rating to be arbitrary or capricious, even if reasonable minds could disagree on the exact level of risk.

### B. Failure to Rely on Later Telemetry Data

Petitioners next argue that the Forest Service failed to consider telemetry data of the Central San Juan bighorn herds when making its decision. While the Service relied on some preliminary data from the state, it did not wait to review all data that had been collected, or would be collected in the near future, before issuing its Assessment and Finding. The Service says it could not access all of that data in time, a point that Petitioners dispute.

As petitioners note, the Tenth Circuit has "recognized that agencies must use the 'best available scientific information' when assessing environmental impacts" under NEPA, at least for purposes of Environmental Impact Statements. *Lee v. U.S. Air Force*, 354 F.3d 1229, 1244 (10th Cir. 2004) (finding that the agency was not required to carry out its own

study for purposes of an Environmental Impact Statement and that it had relied on the best available information). But an "agency's obligation in regard to incomplete or unavailable information is governed by the CEQ regulations." *Id.* at 1241 (citing 40 C.F.R. § 1502.22 (effective to September 13, 2020)). One such regulation, 40 C.F.R. § 1502.22, governs cost-benefit analyses for Environmental Impact Statements, which the Service did not produce here. *Env't Prot. Info. Ctr. V. Blackwell*, 389 F. Supp. 2d 1174, 1188 n.8 (N.D. Cal. 2004) (noting that § 1502.22 does not apply to EAs "on its face" and that the regulation, to the extent it can serve as guidance as to EAs should not "apply with full force.")

Petitioners have cited no apparent authorities governing what the Service was required to do, particularly in the face of incomplete, unavailable, or non-public information, before preparing an EA and FONSI. To the contrary, petitioners' cited authorities relate to environmental impact statements, or other statutes entirely.[3] *See Lee*, 354 F.3d 1241-44 (addressing this issue in the context of what must be included in an EIS); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1189 (10th Cir. 2006) (affirming dismissal of NEPA claim but reversing claim under the National Forest Management Act claim based on "best available science" language found in regulations implementing that separate act); *Blackwell*, 389 F. Supp. At 1188 (noting that regulation cited in *Lee*, on its face, does not apply to preparation of an EA).

---

[3] While the petition contains a claim under the National Forest Management Act, none of petitioners' briefing appears to reference that act or that claim. *See* Doc. 36 at 18 n.5 (Service pointing out this fact); Doc. 39 (petitioners' reply failing to address this issue). While this claim and arguments in favor of it may not be truly "waived" as the Service suggests, such arguments appear to have been forfeited. *See Wood v. Milyard*, 566 U.S. 463, 474 (2012).

Even under the more onerous standard applicable to Environmental Impact Statements, agencies need only seek out such information if it "is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant." 40 C.F.R. § 1502.22(a) (effective to September 13, 2020). And such "costs" include "costs in terms of time (delay) and personnel." *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 155 (D.D.C. 2014) (quoting 51 Fed. Reg. 15,622 (April 25, 1986)).

Applied here, the Service complied with NEPA despite failing to wait for and seek out all of the telemetry data that petitioners later obtained from the state, even under the more demanding standard for Impact Statements. As petitioners note, Colorado Parks and Wildlife began collecting this telemetry data in January 2016, and there appeared to be some information sharing of this data between the Service and the state. *See* WA3779-85 (emails from state officials to Service officials apparently regarding portions of this telemetry data). But it also appears that the data was not even finalized (to the extent such ongoing tracking data of bighorns is ever truly "finalized") until after the Service issued its EA and FONSI in March 2018, as alleged by petitioners. Doc. 1 (petition alleging that "data collection from these telemetry collars is continuing, and CPW stated that a full analysis of results is anticipated in 2019"). It appears that petitioners obtained at least *some* of this data in October 2018, but only after filing an open records request with the state. Doc. 35 at 9. And the Service did not obtain a more complete dataset until 2019 (consistent with the petition's allegation) and only after signing a confidentiality agreement with the state. WA5847, 5880.

Given all this, the Service did not act arbitrarily or capriciously in failing to obtain all current and *future* data before making its decision. Petitioners cite no specific authority for what the Service had to do

before preparing an Assessment. And the Service did rely on preliminary telemetry data in preparing its Assessment. Petitioners' suggestion that the Service had to wait until "all" telemetry data was finalized has little support in the record or in the legal authorities that petitioners cite. Vacatur on this ground therefore is inappropriate.

### C. Failure to Consider All Effects

Petitioners also argue that the Service "failed to consider all effects of the action." Doc. 33 at 30-31. Agencies must consider direct, indirect, and cumulative impacts in making its decisions under NEPA, at least those "to be considered in an environmental impact statement." 40 C.F.R. § 1508.25(c) (effective to September 13, 2020). At least one other circuit has applied this standard to Assessments as well as Environmental Impact Statements. *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010). In any event, "establishing an area of potential effects requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1091 (10th Cir. 2004).

Here, petitioners argue that the Assessment failed to address (or improperly dismissed) risks to neighboring bighorn populations. But the central concern animating the entire Assessment was evaluating such risks, which the Assessment did address. *See* Doc. 36 at 26-28. Petitioners appear to counter that the Assessment did not consider two specific "indirect" effects: disease transmission to the Central San Juan herds, and "future increased risk to the Central San Jaun herds if they grow in size." Doc. 39 at 23. But, again, the Service did not ignore these potential effects; instead, it only came to a different conclusion about the risks of these effects than petitioners would have preferred. That does not

amount to arbitrary or capricious action, and vacatur is not appropriate on this ground either.

## IV.    Failure to Prepare an Environmental Impact Statement

Petitioners also argue that the Forest Service was required to prepare an Impact Statement rather than just an Environmental Assessment and Finding of No Significant Impact. Doc. 33 at 15-20. As noted above, before issuing a FONSI for the Wishbone Allotment plan, the Forest Service was required to conclude that the plan would "not have a significant effect on the human environment." *Conner*, 920 F.3d at 1261 (quoting former 40 C.F.R. § 1508.13). Under the regulations in effect when the Forest Service made its decision, a "significant" effect hinged on the "context" of the effect and the "intensity" of the effect. 40 C.F.R. § 1508.27 (effective to September 13, 2020). The relevant context includes the geographic effect of the agency action and the short- and long-term effects of such action. *Id.* § 1508.27(a). The "intensity" analysis implicates a variety of factors, including:

- the degree to which the effects on the environment are likely to be highly controversial;

- the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risks;

- the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; and

- whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

*Id.* § 1508.27(b)(4)-(7). But the ultimate question, even after assessing these factors, is whether the Forest Service acted "arbitrarily and capriciously" in determining that the Wishbone allotment would not have a

"significant" impact on the environment.

Petitioners argue that all four of these factors suggest that the Wishbone Allotment plan would cause a "significant" impact requiring issuance of an EIS. As to the first "highly controversial" factor, "even in the absence of substantial public opposition, an action may be 'highly controversial' if there is a substantial dispute as to the size, nature, or effect of the action. 920 F.3d at 1263 (quotation and citation omitted). The mere existence of scientific debate, however, does not render a proposed action highly controversial. *Indiana Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 861 (7th Cir. 2003). And the Service's own assessment that an action is not highly controversial is owed deference "if it is made after a hard look at the controversy and rationally related to the data." *Id.*

The agency action, although disputed, did not rise to the level of "highly controversial." There was a dispute, of course, before the Service issued its Assessment and Finding. But the disputed effects of the action here are much smaller than those cited in the cases that petitioners cite. *E.g.*, *Norton*, 294 F.3d at 1230-31 (addressing the loss of a critical habitat designation for an endangered species). And petitioners' disputes with the Services' methodology, standing alone, do not render the agency action highly controversial or in violation of the APA. *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1212 (10th Cir. 2002) ("The fact that the Service did not employ a particular method of analysis in its study . . . does not render its Environmental Assessment inadequate.").

As to the uncertainty of the risk, the risk here is not so uncertain as to require an Environmental Impact Statement. Though there is some difference in survey data over the years, that alone does not render the uncertainty so high as to require an EIS. *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, 2017 WL 5247929, at *8 (D. Wyo. Mar. 20, 2017).

There is little uncertainty that domestic sheep pose at least some risk of disease transfer to bighorns if they come into contact. And while there are some disputes as to what level of risk the Wishbone Allotment plan will impose, those disputes do not rise to the level of "highly" uncertain. *See id.* at *10.

Next, petitioners argue that the Wishbone Allotment plan will establish a precedent because it is the first time the Service failed to exclusively rely on the Risk of Contact Model to assess the risk of disease spread among sheep.[4] But as the Service points out, this Assessment is non-binding by nature and specific to a relatively small geographic region in Colorado, weighing against requiring an EIS. *Oregon Wild v. United States*, 107 F. Supp. 3d 1102, 1114 (D. Or. 2015). The court does not see how this plan will create a precedent sufficient to warrant an EIS, and petitioners cite no specific authority suggesting that it would.

Finally, petitioners argue that the cumulative risk from grazing from *other* allotments, coupled with grazing on the Wishbone Allotment, "could be significant." Doc. 33 at 25. Petitioners fail to identify what other allotments pose such a risk and sidestep this issue on reply. Doc. 39 at 25. In any event, the Service has vacated a number of allotments to help alleviate such a risk.

---

[4] Petitioners raised a related argument on reply that the Service's reliance on local factors in addition to the Risk of Contact Model amounted to an arbitrary change in policy and practice. *See* Doc. 39 at 6-10. Because this argument was raised for the first time on reply, it is forfeited. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). In any event, the Service did explain why it relied on local factors in addition to the Risk of Contact model: that model failed to account for local knowledge specific to the region and herds at issue, all as outlined above. That is a sufficiently "rational explanation" for any purported departure from prior procedure. *See WildEarth Guardians v. U.S. E.P.A.*, 770 F.3d 919, 941 (10th Cir. 2014) (rejecting argument that agency acted arbitrarily due to purported inconsistent positions).

The ultimate question is whether, after considering these factors, the Service's finding that the Wishbone Allotment plan would not cause "significant" environmental effects was arbitrary and capricious. *Conner*, 920 F.3d at 1262. The factors all weigh toward concluding that the decision was not arbitrary and capricious. The Service therefore was not required to prepare an Environmental Impact Statement.

## V.   Failure to Perform a Supplemental Assessment

Petitioners last argue that the Service's use of a Supplemental Information Report to address the later telemetry data violated NEPA. Petitioners contend that the Service was required to prepare a supplemental Environmental Assessment in light of the telemetry data.

At least under Ninth Circuit precedent, NEPA requires issuance of a supplemental Environmental Assessment when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Earth Island Inst. v. United States Forest Serv.*, 87 F.4th 1054, 1069 (9th Cir. 2023) (quoting 40 C.F.R. § 1502.9(d)(1)(ii) (effective post-September 14, 2020)). Supplemental Information Reports may be used to inform the assessment of whether a supplemental Environmental Assessment must be issued. *Id.* Supplementation is not required if the agency takes a "hard look" at the new information and "determines that the impact will not be significantly different from those it already considered." *Id.* The same arbitrary and capricious standard applies to a decision not to supplement an assessment. *Id.*

Here, the Service did not act arbitrarily or capriciously in determining, in light of more complete telemetry data, that a supplemental assessment was not necessary. The Service re-ran its Risk of Contact Model with the new data and determined that there was a "27% increase in modeled contact" based on the results of that model alone. WA5888.

But, in light of the same local factors that reduced the risk assessment for purposes of the Assessment, the Service concluded that there was no significantly increased environmental risk warranting another full-blown assessment. WA5889. Much of petitioners' argument is that the supplemental information report serves as a post-hoc rationalization for the Service's original assessment, further suggesting that it only confirms what the Service concluded in the first place.

Indeed, many of petitioners' arguments as to this issue stand in strong tension with one another. For example, they argue that the supplemental information report cannot be considered because it serves as an untimely justification of the original Assessment. But it appears that the Service created the report in part based on demands made by petitioners that the Service consider later-created telemetry data held, in confidence, by a third party. Petitioners have also argued that all this information was available to the Service, yet they also claim that *they* could not access the telemetry data because it included information "collected through July 4, 2018," several months after the issuance of the Assessment and Finding. Doc. 39 at 31. These countervailing demands that petitioners hope to place on the Service far exceed those imposed by NEPA and the APA. The Service therefore did not act arbitrarily or capriciously in determining, after taking a hard look at the new telemetry data, that a supplemental assessment was not warranted.

## CONCLUSION

Petitioners' Motion to Strike, Doc. 24, is **DENIED**.

The Court finds that the Service's actions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that the Service did not violate NEPA or the APA. The court

therefore **AFFIRMS** the Service's actions.

DATED: March 7, 2024          BY THE COURT:

_____
Daniel D. Domenico
United States District Judge